## SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

**CREDIT BANCORP, LTD., Credit Bancorp, Inc., Richard Jonathan Blech, Thomas Michael Rittweger and Douglas C. Brandon, Defendants.**

**No. 99 CIV. 11395(RWS).**

United States District Court, S.D. New York.

Oct. 16, 2001.

Securities and Exchange Commission by Thomas M. Melton, Salt Lake City, UT, for Plaintiff.

Securities and Exchange Commission by Robert Blackburn,New York City, Local Counsel.

Morrison & Foerster by Carl H. Loewenson, Receiver and Fiscal Agent, Oliver Metzger, Andrew J. Fields, New York City, for Receiver.

Szaferman, Lakind, Blumstein, Watter, Blader, Lehmann & Goldshore by Scott P. Borsack, Lawrenceville, NJ, for Leonid and Bella Shapiro.

Sheldon A. Weiss, Mountainside, NJ, for Lorraine Jankowski.

## OPINION

SWEET, District Judge.

Carl Loewenson Jr. (the "Receiver"), as receiver for Credit Bancorp, Ltd. and its

affiliated entities ("CBL"), has moved this Court for an order allowing certain customer accounts held by CBL "for the benefit of" certain of its customers (the "FBO Accounts") to be treated similarly to all other CBL customer accounts in order to implement the Plan of Partial Distribution approved on November 29, 2001. *SEC v. Credit Bancorp Ltd.*, 2000 WL 1752979 (S.D.N.Y.). The motion is opposed by two of the holders of such F.B.O. accounts—Lorraine Jankowski ("Jankowski"), and Leonid and Bella Shapiro (the "Shapiros"). Because title to these accounts was in the hands of CBL and the inclusion of "FBO" and a customer's name in the registration of the account did not materially affect CBL's ability to use the FBO Accounts as part of CBL's Ponzi scheme, the accounts are to be treated the same as the other CBL customer accounts and the motion of the Receiver is granted.

### Prior Proceedings

Certain of the prior proceedings are described in previous opinions of this Court, familiarity with which is presumed. *See SEC v. Credit Bancorp, Ltd.*, 194 F.R.D. 457; *SEC v. Credit Bancorp, Ltd.*, 93 F.Supp.2d 475 (S.D.N.Y.2000); *SEC v. Credit Bancorp, Ltd.*, 96 F.Supp.2d 357 (S.D.N.Y.2000); *SEC v. Credit Bancorp, Ltd.* 103 F.Supp.2d 223; *SEC v. Credit Bancorp, Ltd.*, 109 F.Supp.2d 142 (S.D.N.Y.2000); *SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395, 2000 WL 968010 (S.D.N.Y. July 12, 2000); *SEC v. Credit Bancorp, Ltd.*, 194 F.R.D. 469 (S.D.N.Y. 2000); *SEC v. Credit Bancorp, Ltd.*, 2000 WL 1170136.

On November 29, 2000, this Court approved a plan of partial distribution which is in essence a pro rata return of customer-deposited property of the CBL customers, either in the form of deposited property, *i.e.* securities, or in the form of cash or replacement securities. *See SEC v. Credit Bancorp Ltd.*, 2000 WL 1752979 (S.D.N.Y.); *SEC v. Credit Bancorp Ltd.*, 129 F.Supp.2d 259 (S.D.N.Y. Jan. 19, 2001); Orders of January 19, 2001 and May 16, 2001.

In order to effectuate that plan, the Receiver now seeks a declaration that the FBO accounts, as described more fully below, may be treated the same as other CBL customer accounts. The four FBO accounts are held by Ms. Jankowski, the Shapiros, Jeff and Helen Hoyak, and Rose Kocinski. The motion was marked fully submitted on June 27, 2001.

### Facts

There is no genuine dispute as to the facts relevant to this opinion.

In the process of marshalling the assets of CBL, the Receiver in this case has located numerous accounts at financial institutions in the United States and Europe. Almost all of these accounts are registered in the name of "Credit Bancorp" or some variation thereof. However, the Receiver has identified four accounts that are registered in the name of Credit Bancorp (or some variation thereof) with the designation "FBO" (meaning "for the benefit of") and then the name of one of CBL's customers. These accounts have previously been brought to the Court's attention. *See SEC v. Credit Bancorp, Ltd. et al.*, 99 Civ. 11395, 2000 WL 1752979, at *10 n. 8 (S.D.N.Y. Nov. 29, 2000).

Leonid and Bella Shapiro, Jeff and Helen Hoyak, Lorraine Jankowski and Rose Kocinski had accounts at various mutual funds prior to their involvement with CBL. Each of these customers then entered into an agreement with CBL and instructed the mutual fund with which they had an account to create a new account in the name of "CBL" or some variation thereof, followed by "FBO," meaning "for the benefit of," followed by the customer's name.

Unbeknownst to these customers, CBL then attempted to transfer the assets in these accounts to other accounts that were in the name of CBL alone (*i.e.*, accounts that lacked "FBO" and the customer's name). These attempts failed, however, because CBL supplied the mutual funds with improper paperwork. CBL was quite capable, however, of providing the proper paperwork, and in fact successfully transferred other accounts that were registered at mutual funds in the name of "CBL FBO [customer]."

The CBL FBO accounts at issue in this motion were frozen pursuant to the asset freeze entered in this case, and remain open and frozen to this day.

### The Shapiro FBO Account at Alliance Capital

Prior to becoming involved with CBL, Leonid and Bell Shapiro had an account at Alliance Capital ("Alliance"), a mutual fund (the "Shapiro Joint Tenant Account"), and the mailing address was the Shapiros' mailing address in Lawrenceville, New Jersey.

On or about March 27, 1999, the Shapiros executed a standard CBL Credit Facility Agreement and Trustee Engagement Letter. They also received from CBL and executed a transfer instruction letter and a blank stock power. The transfer instruction letter, which was dated March 25, 1999, instructed Alliance to re-register all of the shares in the Shapiro Joint Tenant Account "into CBL's name for the benefit of Leonid and Bella Shapiro," and to put the shares in the mutual fund in certificate form and mail them to defendant Thomas Rittweger ("Rittweger") at CBL.

On April 8, 1999, Alliance opened a new account with the registration CREDIT BANCORP CUST FBO LEONID & BELLA SHAPIRO (the "Shapiro FBO account"). Alliance transferred 35,542.7670 shares of Alliance Municipal Income Fund II, worth $372,488.20 at the time, from the Shapiro Joint Tenant Account into the Shapiro FBO account.

CBL attempted to have the assets in the account transferred to a non-FBO account in the name of CBL, but the attempt failed. Pursuant to the transfer instruction letter that the Shapiros had executed, Alliance issued a certificate on April 21, 1999, representing shares in the municipal bond fund held in the Shapiro FBO account, and apparently sent the certificate to CBL. The certificate was in the name of CREDIT BANCORP CUST FBO LEONID & BELLA SHAPIRO. On or about May 6, 1999, the certificate came back to Alliance Fund Services with a letter from Swiss American Securities Inc. ("SASI") requesting that Alliance transfer the shares held in the Shapiro FBO account (and represented by the certificate) to Sema & Co. at a New York address. On May 12, 1999, Alliance responded with a letter stating that it could not effect the transfer without (i) a letter of instruction from the current custodian, Credit Bancorp, with a medallion-guaranteed signature of an authorized signer, and (ii) a certified copy of a corporate resolution confirming the authority of the officer(s) executing the stock power with a guaranteed signature. The letter did not request an instruction letter from the Shapiros, nor did it request that the Shapiros' signatures accompany any request for transfer of assets out of the account.

Because the mailing address on the Shapiro FBO account was the Shapiros' home address, Alliance's response letter was sent to the Shapiros' home address. Confused because they had not seen the SASI letter to which the Alliance letter was responding, and concerned because they had not requested any transfers in the account, the Shapiros called their account represen-

tative at Alliance who told them not to worry about it. The Shapiros did nothing further. Alliance eventually cancelled the certificate, and redeposited the shares in the Shapiro FBO account.

One exchange was made within the account. On or about October 19, 1999, the Shapiros executed a form on which they requested that their shares in the Alliance New Jersey Municipal Bond Fund be liquidated and the resulting funds be reinvested in a money-market account.[1] The request was apparently sent to defendant Douglas Brandon ("Brandon"), who forwarded it to Rittweger with the handwritten instruction: "Please execute trade as instructed below." It appears, however, that Alliance did not execute the trade because on October 21 the Shapiros' broker at Pacvest, Bruce Butler ("Butler"), sent a fax to Brandon stating that the trade request "hit up at Alliance" on the 21st, but that "Alliance canceled the request." The fax also states that the "[t]he reason the exchange request was cancelled is because the account is (apparently) set up to accept orders from either the owner (Leonid/Bella Shapiro) or the broker of record (Bruce Butler) only." Butler then states that he gave the authorization for the exchange by telephone. Alliance's records show that a telephone exchange was executed within the Shapiro FBO account on October 21, 1999.

At some point between the opening of the account and the SEC's initiation of this litigation, the Shapiros received a "custodial dividend" from CBL of $3,703.03. The Shapiros have offered to repay this dividend, provided that they can regain control of the account. The account at Alliance remains open today with the registration CREDIT BANCORP CUST FBO LEONID & BELLA SHAPIRO. The account contains approximately $370,000 worth of shares in a mutual fund. The account does not have a margin lien, and statements for the account do not reflect any withdrawals from the account.

Alliance considers the Shapiro FBO account to be a "Broker/Dealer Custodial" account. The designated broker-dealer for the Shapiro FBO account is CBL. With such accounts, it is Alliance's policy to honor an instruction to liquidate an account, or to transfer shares in such an account, provided that the designated broker-dealer supplies "(1) a written request bearing a Medallion signature Guarantee, (2) a certified copy of the corporate resolution confirming the authority of the officer submitting the request within 30 days of Alliance's receipt, and (3) a W–9 certification for each account to which a transfer is being made if the tax identification number is different." Thus, "the account [can] be redeemed without the signatures of the Shapiros' and 'based on the registration the owner of the account ... is Credit Bancorp.'" Alliance would not honor an instruction to transfer or liquidate the Shapiro FBO account from the Shapiros.

### The Hoyak FBO Account at MFS

Prior to becoming involved with CBL, Jeff and Helen Hoyak had several accounts at MFS Investment Management ("MFS"), a mutual fund institution. One of these accounts was registered in the name of JEFF HOYAK & HELEN HOYAKJT WROS [2] (the "Hoyak Joint Tenant Account").

---

1. This transaction is characterized by the Receiver as a "transfer" and by the Shapiros as a "liquidation" and "reinvestment". However, there is no dispute about the substance of the transaction which was the movement of funds within Alliance Capital.

2. "JT WROS" means "joint tenant with right of survivorship."

The CBL records in the possession of the Receiver do not include a signed Trustee Engagement Letter or Credit Facility Agreement for the Hoyaks. The Receiver's records do not include a signed transfer instruction letter.

On May 10, 1999, MFS opened an account with the registration CREDIT BANCORP LIMITED FBO JEFF HOYAK & HELEN HOYAK, and a mailing address of CBL's offices in Geneva, Switzerland (the "First Hoyak FBO Account"). All of the assets in the Hoyak Joint Tenant Account, approximately $32,000 worth, were transferred into the First Hoyak FBO Account. Subsequently, on August 24, 1999, all of the assets in the First Hoyak FBO Account were transferred to a new account (the "Second Hoyak FBO Account"). This account also bore the registration CREDIT BANCORP LIMITED FBO JEFF HOYAK & HELEN HOYAK, but had a different account number and a mailing address of CBL's offices in Toms River, New Jersey.

On June 18, 1999, MFS issued a certificate for all of the assets in the First Hoyak FBO Account: 3,440 shares of MFS Government Securities Fund B. The certificate appears to have been redeposited as an identical number of shares were deposited in the First Hoyak FBO Account on August 16, 1999.

On or about August 31, 1999, MFS received an instruction letter from CBL, signed by defendant Richard Blech ("Blech"). The letter instructed MFS to "reregister all shares of the above referenced fund into the name of Credit Bancorp Limited. Please remove the language 'for the benefit of Jeff Hoyak.'" The letter also requested a transfer in kind to an account at SASI in the name of

Credit Suisse Private Banking, for the further credit of CBL. CBL also sent another letter on September 14, 1999. This letter, which was signed by Cynthia Craig of CBL's San Diego office, attached a new instruction letter from Blech. The new instruction letter contained the same requests to take the "for the benefit of Jeff Hoyak" wording out of the registration on the account, and to transfer the assets to an account at SASI, but the letter now bore a signature guarantee. An IRS form W–8 and a CBL corporate resolution were also attached.

By letter dated September 16, 1999, MFS responded to Blech that it was unable to process the transfers because CBL had not provided the following documentation: (i) a corporate resolution evidencing Blech's authority as President/CEO to authorize the sale of the shares (along with a certification by the Secretary of the corporation less than 60 days old); (ii) a new letter of instruction signed by Blech, with signature guarantee; and (iii) a corporate seal if required by state law. The letter from MFS did not request a signature or letter of instruction from the Hoyaks. The letter assured Blech that once the paperwork was in order, "[t]he shares will be redeemed at the closing net asset value of the fund on the day these items are received" and that "[a] check for the proceeds will be mailed within seven days." On September 22, 1999, MFS also sent another letter [3] to CBL stating that the paperwork was still not in order because MFS needed (i) "A letter of instruction, signed by an authorized officer, clarifying the new nominee registration for [the] account"; and (ii) "an extract from the bylaws or resolution that specifies by name

---

**3.** It may be that MFS's September 16 letter and CBL's September 14 letter passed each other in the mail.

and by title the authorized officers of the Corporation, certified by the Secretary or other appropriate officer within 60 days." "Once we receive them," the letter concluded, "we will process the transfer." However, CBL apparently never sent the required paperwork, and the transaction was never effected.

The Second Hoyak FBO Account remains open today, with assets that were worth $43,973.78 on December 31, 2000. The Hoyaks received a custodial dividend from CBL of $1,664.48.

MFS considers the Second Hoyak FBO Account to be a "Corporation" account. Prior to the appointment of the Receiver, a request to transfer or liquidated assets in the account would have been honored by MFS only if MFS received the following documents generated by CBL: "[i] an endorsement by an appropriate officer with signature guarantee, [ii] a copy of a resolution or by-laws supporting the authority of the assigning officer, certified by the secretary or an officer other than the assigning officer, and [iii] a letter of instructions." MfS would not require a signature or instruction letter from the Hoyaks, and MFS would not accept instructions to transfer or liquidate assets in the account from the Hoyaks.

### The Jankowski FBO Account at MFS

Prior to becoming involved with CBL, Lorraine Jankowski had an account at MFS Investment Services (the same mutual fund institution that held the Second Hoyak FBO Account). This account bore the registration LORRAINE JANKOWSKI, the account number 818741214, and a mailing address in Morganville, New Jersey (the "1214 Account").

On or about February 8, 1999, Ms. Jankowski executed a standard CBL Trustee Engagement Letter and Credit Facility Agreement.

On July 2, 1999, MFS opened an account with the registration CBLS FBO LORRAINE JANKOWSKI[4] and a mailing address of CBL's Geneva, Switzerland offices (the "First Jankowski FBO Account"). All of the assets in the 1214 Account were transferred to the First Jankowski FBO Account. The CBL documents in the possession of the Receiver do not contain a transfer instruction letter for this transaction. MFS issued a certificate the same day, representing all of the shares. The certificate was then redeposited in the First Jankowski FBO Account on August 16, 1999. On August 24, 1999, all of the assets in the First Jankowski FBO Account were transferred to a new account (the "Second Jankowski FBO Account"), which bore the same registration, but had a different account number.

CBL sent a transfer instruction letter to MFS on September 14, 1999. This letter also included instructions to transfer assets out of the Second Hoyak FBO Account. In the letter, CBL requested, as it did for the Second Hoyak FBO Account, that MFS delete "for the benefit of Lorraine Jankowski" from the account registration, leaving only "Credit Bancorp Limited," and then transfer the shares in the account to an account at SASI in the name of Credit Suisse Private Banking. The letter bore a signature guarantee, and an IRS form W–8 and a corporate resolution were attached. MFS, however, responded in the same letter in which it responded to the request to transfer the shares from the Second Hoyak FBO Account, that it was unable to process the transfers because

---

4. The Receiver's investigation has not revealed why "CBLS" was used in this account registration rather than "CBL."

CBL had not provided the following documentation: (i) a corporate resolution evidencing Blech's authority as President/CEO to authorize the sale of the shares, along with a certification by the Secretary of the corporation less than 60 days old; (ii) a new letter of instruction signed by Blech, with a signature guarantee; and (iii) a corporate seal if required by state law. The letter did not request a signature or letter of instruction from Ms. Jankowski.

The Second Jankowski FBO Account remains open today, with assets that were worth $67,782.71 on December 31, 2000. Jankowski received a custodial dividend of $570.32.

MFS classifies the Second Jankowski FBO Account as an "Institution" account. With such an account, as with a "Corporation" account at MFS like the Second Hoyak FBO Account, a request to transfer or liquidate assets in the account would have been honored by MFS only if MFS received the following documents generated by CBL" "[i] an endorsement by an appropriate officer with signature guarantee, [ii] a copy of a resolution or by-laws supporting the authority of the assigning officer, certified by the secretary or an officer other than the assigning officer, and [iii] a letter of instructions." MFS would not require a signature or instruction letter from Ms. Jankowski, and MFS would not accept instructions to transfer or liquidate assets in the account from Ms. Jankowski.

### The Kocinski FBO Account at AIM

Prior to becoming involved with CBL, Rose Kocinski had an account at AIM Fund Services, Inc. ("AIM"), a mutual fund institution. That account bore the registration ROSE KOCINSKI, and the account number 5002246667 (the "6667 Account"). The CBL records in the possession of the Receiver do not contain a signed Credit Facility Agreement or Trustee Engagement Letter for Ms. Kocinski.

On or about January 21, 1999, Ms. Kocinski executed a transfer instruction letter that directed AIM Funds to deliver the assets in the 6667 Account to SASI for the further credit of CBL. The instruction letter does not request that the shares be put in certificate form, or that the deposit be made "for the benefit of Rose Kocinski." Apparently this instruction was not honored, however, as it does not appear that any transfer to SASI occurred.

On February 4, 1999, AIM Funds opened a new account in the name of CREDIT BANCORP FBO ROSE KOCINSKI (the "Kocinski FBO Account"). At that same time, all of the assets from the 6667 account were transferred into the Kocinski FBO Account.

The statements for the account reflect that on the next day, February 5, 1999, AIM issued a certificate. That certificate was issued in the name of CREDIT BANCORP FBO ROSE KOCINSKI. On or about May 6, 1999, SASI sent a letter to AIM requesting, just as it had done for the Shapiros' Alliance shares, that the Kocinski shares be transferred to an account at Sema & Co., with a New York address. AIM then sent a letter, dated May 11, 1999, stating that "we will be glad to process these requests," upon the receipt of (i) a request from an authorized representative of CBL's "back office/Retirement Plans Department"; (ii) a signature guarantee; and (iii) a certified corporate resolution. Finally, the letter states that AIM is redepositing the certificates in the Kocinski FBO Account. The letter does not request any signature or approval by Ms. Kocinski.

The Kocinski FBO Account at AIM remains open today, with assets that were worth $27,461.08 on March 15, 2001. It

appears that Ms. Kocinski did not receive a custodial dividend from CBL, but received a refund of cash that she deposited with CBL.

AIM considers the Kocinski FBO Account to be a "Non–Prototype Retirement Plan (With a Third Party Custodian)." AIM's policy is that "[a]ny request for transactions involving a custodial account must come from an authorized officer of the custodian's back office/Retirement Plans Department." Thus, AIM would honor requests for transactions in the Kocinski FBO Account only if provided with the following documents generated by CBL: (i) a signed request; and (ii) a certified copy of a CBL corporate resolution, dated within 30 days of the transaction request, that lists the authorized signers for CBL. The certification should include a raised corporate seal and cannot be certified by the same officer who authorized the transaction. Ms. Kocinski is not authorized to effect transfers or liquidations of the assets in the account.

### Other FBO Accounts Were Successfully Transferred

#### (a) *The Jankowski FBO Account at AIM Funds*

An account registered in the name of CREDIT BANCORP FBO LORRAINE JANKOWSKI once existed at AIM Funds, but the assets in that account were successfully transferred pursuant to instructions from CBL to a non-FBO account in the name of BHC Securities Inc.

Though it encountered difficulties doing so, CBL did succeed in transferring assets, worth approximately $60,000, out of an account registered in the name of CREDIT BANCORP FBO LORRAINE JANKOWSKI into an account that did not bear the name of Jankowski at all. The CBL records in the possession of the Receiver reflect that 1,343 shares of AIM Value

Fund B are now in a CBL account at ING in Monaco. Because the Receiver does not have the complete records for the ING account, the Receiver is not able to confirm that these are the same shares that came out of the FBO account, but the similarity in share number (1,342 versus 1,343) strongly suggests that they are. It is thus very likely that the assets in the AIM Jankowski FBO Account are now in CBL's account at ING.

#### (b) *The Jankowski FBO Account at Davis Funds*

Ms. Jankowski had at one time an account at Davis Funds, another mutual fund institution, in the name of LORRAINE JANKOWSKI. On April 27, 1999, all of the shares in this account were transferred to an account in the name of THOMAS RITTWEGER CREDIT BANCORP FBO LORRAINE JANKOWSKI. Then on August 27, 1999, all of the assets in this account were transferred to an account at Davis Funds in the name of SEMA & Co.

The documents produced to the Receiver by Davis Funds contain transfer instruction letters from CBL to Davis Funds, but the dates of these letters do not coincide with the dates of the transfers. The produced documents also contain records of electronic transfers: it may be that CBL effected these transfers electronically, without a letter of instruction. The fact remains, however, that assets flowed from a customer account to an FBO account to an account without Jankowski's name in the registration.

#### (c) *The Hoyak FBO Account at Davis Funds*

Jeff Joyak had at one time an account at Davis Funds with the registration JEFF HOYAK. On March 24, 1999, all of the assets in this account were transferred to an account in the name of THOMAS

RITTWEGER CREDIT BANCORP FBO JEFF HOYAK. Then on August 30, 1999, all of the assets in this FBO account were transferred to the same SEMA & CO. account to which the assets in the Jankowski Davis Funds account were transferred.

Like the assets in the Jankowski FBO Account at Davis Funds, the assets in the Hoyak FBO Account at Davis Funds flowed from a customer account to an FBO account to an account without Hoyak's name in the registration. Both of these accounts demonstrate that CBL was able to transfer assets out of FBO accounts.

### CBL Was in the Process of Transferring Its FBO Accounts

Internal CBL documents reveal that CBL was actively attempting to transfer the shares out of numerous mutual fund accounts that were in the name of CBL FBO [customer]. These documents contain lists of mutual fund shares and the destinations that CBL planned for those assets—indeed, the transfer process was formalized into a series of ten steps. Some of the assets on the list were transferred successfully; others had not been transferred by the time the asset freeze was put in place.

The list contains some entries that coincide with the facts recounted above. For example, on September 22, 1999, MFS sent a letter to CBL requesting additional documentation for a transfer out of the Second Hoyak FBO Account. One of the CBL internal documents includes an entry that lists Jeff Hoyak's initials (reversed), then "9/23–MFS needs add'l info—new corp resolution." The document shows the planned destination as Credit Suisse, Zu-

rich. This list also contains an entry that lists Lorraine Jankowski's initials, followed by "AIM Value Fund—CLB" and "BBH booked on 10/21," presumably a reference to the letter sent by Brown Brothers Harriman on October 18, 1999, that effected the transfer of the Jankowski AIM Account to the BHC Securities account. The document lists a destination for the funds of "ING Zurich," and almost the exact same number of shares that can be found there today.

Only one attempt was made to transfer the Shapiros account at Alliance Capital. A list of such accounts was prepared nine days before the asset freeze, indicating the imminence of an effort by CBL to transfer FBO Accounts of the sort at issue in the instant motion.

### The FBO Accounts Were Under the Control of CBL Under the U.C.C.

█ CBL had the legal authority and practical ability to transfer or liquidate the assets in the CBL FBO Accounts. The FBO customers, on the other hand lacked this authority. Thus, the inclusion of "FBO" in the registration of the CBL FBO Accounts did not materially affect CBL's ability to use the CBL FBO Accounts as part of its Ponzi scheme.

Under the U.C.C.,[5] the four mutual funds at issue here are required to honor transfer or liquidation instructions from the "entitlement holder" on the CBL FBO Accounts. See U.C.C. §§ 8–102(a)(8), 8–507(a), 8–107(a)(3), 8–107(a)(4)–(5). Here, CBL is the "entitlement holder."

While the U.C.C. does not include any specific provision defining "FBO", it does

---

**5.** CBL's standard Credit Facility Agreement provides that it will be governed by the "laws of the State of Kentucky and the United States of America." Revised Article 8 of the U.C.C. has been adopted in Kentucky in substantially the same form as the uniform version of the

U.C.C. See Ky.Rev.Stat.Ann. § 355.8–501 to § 355.8–511 (Baldwin 2000). Revised Article 8 has also been adopted in New York in substantially the same form as the uniform version of the U.C.C. See N.Y.U.C.C. § 8–501 to § 8–511 (McKinney 2001 Supp.).

include a provision that assumes that the ordinary practice in the securities industry would be to treat CBL and not the FBO customers as the entitlement holder on the account. The U.C.C. provides in pertinent part:

> If a security is registered in the name of or specially indorsed to a person described as a representative, or if a securities account is maintained in the name of a person described as a representative, an indorsement, or entitlement order made by the person is effective even though the person is no longer serving in the described capacity.

U.C.C. § 8–107(d). Here, all of the CBL FBO accounts were held "in the name of a person [i.e. CBL] described as a representative", or simply ignoring the customer altogether. Thus the mutual funds were obligated to honor the entitlement orders from CBL even if CBL were, unbeknownst to the mutual funds, acting without proper authority in issuing the entitlement orders. The fact that CBL was acting beyond the scope of the authority granted to it by the customers would not affect CBL's authority to issue entitlement orders—*i.e.* to transfer or liquidate the account.

Furthermore, each of the mutual funds that holds an FBO Account for CBL, treats CBL, and not the FBO customer, as authorized to liquidate or transfer the assets in the account. Therefore, CBL, not any of the FBO customers, is the entitlement holder on the accounts. None of the institutions requires the signature of the FBO customer or a letter of instruction from the FBO customer. It was within the power of CBL to meet the requirements of Alliance, AIM and MFS without any assistance from the FBO customer.

Thus, the mutual funds that hold the CBL FBO Accounts treat CBL as "entitled to exercise the rights that comprise the financial asset." *See* U.C.C. § 8–501(a).

Each of the mutual fund institutions that held a CBL FBO Account treated CBL as the entitlement holder on the account, entitled to exercise all of the rights of the mutual fund shares held in the account, and did not treat the FBO Customer as entitled to these rights. CBL thus had the legal and practical ability to include the shares in the CBL FBO Accounts in its Ponzi Scheme. The fact that CBL was unsuccessful at *actually* comingling certain of the funds does not change this.

Therefore, the CBL FBO Accounts are not to be treated differently for purposes of the partial distribution of assets to customers.

### The Shapiros' Proffered Factual Distinctions Do Not Call for Different Treatment Under Equity

■ In their opposition to this motion, the Shapiros rely primarily on principles of equity, contending that the general rules of contract, the U.C.C., bailment and tracing can and should be overridden by considerations of equity. *See SEC v. Credit Bancorp, Ltd. et al.,* 2000 WL 1752979 at *13. They concede that similarly situated investors should be treated alike, *see SEC v. Credit Bancorp, Ltd. et al.,* 99 Civ. 11395, 2000 WL 1752979, at *14, but maintain that the factual circumstances of their relationship with CBL set them apart from CBL's other customers.

■ Every CBL customer, including the Shapiros, dealt with CBL in a slightly different manner. In order to be entitled to different treatment in equity, a customer must demonstrate more than a factual difference from other customers: instead, the customer must demonstrate that his or her action or circumstances deserve, as a matter of fairness, greater consideration. The Shapiros offer factual distinctions be-

tween their situation and that of other CBL customers, but these distinctions fail to establish that they deserve preferential treatment to other CBL customers.

First, the Shapiros point out that CBL made only one attempt to transfer their FBO Account and when it failed, CBL did not receive notice and apparently did not notice the lack of response. But even if CBL did lose track of the account, that fact is not relevant to the Shapiros' legal rights, and does not improve their standing vis-a-vis the other customers as a matter of equity.

It is true, as the Shapiros point out, that the mailing address on the Shapiro FBO Account was the Shapiros' home address, so when CBL attempted in May 1999 to transfer shares out of the account via SASI, the rejection letter from Alliance went to the Shapiros rather than back to SASI or CBL. It is also true that CBL appears not to have made any further attempts to transfer the assets in the account. However, neither of these facts altered the legal ownership of the account, which remained with CBL. The Shapiros transferred legal control of the account to CBL in April 1999, when Alliance changed the registration on the account into CBL's name.

Nor would the fact that CBL lost track of the Shapiro FBO Account elevate the Shapiros' claim in equity. CBL's lack of diligence would reflect on CBL's skill at perpetrating a fraud, not on the Shapiros' worthiness as an equity claimant. The Shapiros do not argue that they caused CBL to lose track of the Shapiro FBO Account. They do not explain any way in which their actions deprived CBL of any legal right, or even of the practical ability

to steal assets.[6] Allowing the Shapiros to increase their claim significantly over the other CBL customers based on CBL's actions rather than the Shapiros would be inequitable to CBL's other customers.

While it is true that the Shapiros' assets do not appear on the CBL spreadsheets, this absence is also irrelevant to the equities of the Shapiros' position. First, it cannot be ascertained whether CBL generated other spreadsheets which are not in the possession of the Receiver that did reflect the Shapiro FBO Account. Second, even if the Shapiro FBO Account appeared on none of CBL's spreadsheets, these spreadsheets nonetheless illustrate, as does CBL's 10–step process for transferring mutual fund accounts, that CBL was actively attempting to transfer all such accounts. Given this active program, even if CBL missed one, the spreadsheet only underscores the fortuitous nature of that miss.

The Shapiros secondly rely on the fact that the assets in the Shapiro FBO Account had not been transferred to another CBL account at the time of the asset freeze. The Shapiros cite several receivership cases for the proposition that pro rata distributions are appropriate only where assets have been placed in a "common fund or pool" or "identifiable common accounts or series of accounts" by the time of the asset freeze. Inspection of these cases, however, reveals that they support the opposite of the Shapiros' conclusion.

*SEC v. Forex Asset Management LLC,* 242 F.3d 325 (5th Cir.2001), cited by the Shapiros, presents facts quite similar to the facts of the Shapiro FBO Account, but the appellate opinion addresses and rejects

---

6. CBL could have requested that the registration on the account be changed to CREDIT BANCORP, then requested a transfer of the assets in the account to one of CBL's European accounts. The only additional action that would have been necessary for the Shapiro FBO Account would be to first request an address change on the account.

many of the Shapiros' arguments. In *Forex*, the appellants, customers of the defendant, wrote a check for $800,000 to the defendant's corporation. The defendant deposited the check in a bank account; no other assets were ever placed in that account. The defendant then transferred most of the assets from the account to a brokerage account; no other assets were ever placed into the brokerage account either. Once the asset freeze was in place and a receiver appointed, the receiver recommended to the court that the assets in the brokerage account be treated the same as the defendant's other funds, and that the appellant-customers get back a pro rata share like all of the other customers.

Over the customer's objection, the district court approved a pro rata distribution, and the Fifth Circuit affirmed. *Id.* at 328, 332. The Fifth Circuit reasoned that the customers' argument that they were entitled to the assets because the assets had always been in segregated accounts amounted to a tracing argument, but held that rejection of tracing arguments is appropriate as a matter of equity in such circumstances. *See id.* at 331–32. This Court has similarly considered and rejected tracing arguments advanced by other CBL customers. *See SEC v. Credit Bancorp, Ltd., et al.*, No. 99 Civ. 11395(RWS) 2000 WL 1752979 (S.D.N.Y. Nov. 29, 2000), at *13–19.

In the course of the *Forex* opinion, the Fifth Circuit also considered other cases on which the Shapiros rely. The Court noted that *United States v. Durham*, 86 F.3d 70 (5th Cir.1996), supports pro rata distribution. *See* 242 F.3d at 331. Finally, the *Forex* Court considered an argument based on *Anderson v. Stephens*, 875 F.2d 76 (4th Cir.1989), but rejected it as follows:

Although [appellants] argue that *Anderson* stands for the proposition that

segregated funds should not be subject to a pro rate distribution, we find the court's holding in *Anderson* to pivot on the status of the accounts as frozen, rather than the segregated nature of the funds. Therefore, the reasoning applied in *Anderson* is inapplicable to the present case.

*Forex*, 242 F.3d at 332. The *Forex* case thus cuts against the Shapiros' position.

*United States v. Vanguard Investment Co.*, 6 F.3d 222 (4th Cir.1993), also supports the Receiver's position. The Shapiros cite this case as an example of the proper application of a pro rata distribution, because the property at issue in *Vanguard* was "actually transferred" to the defendant prior to the appointment of the receiver. But that is exactly what happened to the Shapiro FBO Account: the Shapiros transferred title of the Shapiro FBO Account to CBL in April 1999, more than six months before the asset freeze in this case. *Vanguard* thus supports the result urged by the Receiver.

The Shapiros also rely on *SEC v. Black*, 163 F.3d 188 (3d Cir.1998), trying unsuccessfully to depict the Shapiro FBO Account as similar to the 'A' accounts in *Black*. In order to escape the analysis presented in the Receiver's opening brief, the Shapiros state without citation that "Devon had a 'security entitlement' in the [Category 'A'] accounts because of the investment advisory agreements authorizing Devon to direct the purchase and sale of the securities in the account." Thus, the Shapiros argue, if Devon had a security entitled in the 'A' account, the fact that CBL held the securities entitlements in the Shapiro FBO Account does not require the result that CBL (and not the Shapiros) is entitled to the assets in the account.

However, the fact that Devon could direct sales and purchases in the 'A' account did not make Devon the entitlement holder

on the account. A person acquires a security entitlement in one of three ways, excluding exceptions not applicable here: (i) a securities intermediary credits the person's securities account; (ii) a securities intermediary receives an asset from the person for credit to the person's securities account; and (iii) a securities intermediary becomes obligated under law to credit an asset to the person's securities account. U.C.C. § 8–501(b). Thus, the fact that Devon was permitted to execute trade in the 'A' accounts is irrelevant to determining if Devon held any of the securities entitlements in the accounts. What is relevant is that the securities intermediary at issue in *Black* credited securities accounts in the name of the customers, not Devon, with assets. In both the 'A' and 'D' accounts, Devon was not authorized to withdraw either securities or proceeds from the client account. An entitlement holder can redeem a securities entitlement. Thus, Devon was not the entitlement holder on the 'A' accounts, and the Shapiro FBO Account is not analogous to those accounts.

Finally, the Shapiros argue that "[i]t is the existing facts as of the date of the freeze order, and not hypothetical possibilities, that should control." In support of this argument, the Shapiros discuss at length *Anderson v. Stephens*, 875 F.2d 76 (4th Cir.1989) (per curiam), *rev'd CFTC v. Franklin*, 652 F.Supp. 163 (W.D.Va.1986), which held that checks which were deposited by a defendant in a securities receivership action and which were then credited to the defendant's account after an asset freeze should be returned to the drawers of the checks. *See* 875 F.2d at 80–81.

*Anderson* is unavailing because the facts existing at the time of the freeze order in this case demonstrate that CBL held title to the Shapiro FBO Account, and had done so for months. The defendant in *Anderson* carried checks around in his briefcase and did not deposit them at his bank until after the asset freeze. 875 F.2d at 77 n. 4. As the court ruled that the bank should not have accepted the checks, *id.* at 80, the defendant, unlike CBL, never came into ownership of the assets represented by the checks.[7] The *Anderson* case is thus clearly distinguishable from the instant case.

Finally, the Shapiros focus on various facts that they claim distinguish their claim in equity from those of the other CBL customers. These include the financial impact that this motion will have on them. The Shapiros also construct a ten-item list out of this Court's November 29, 2000 opinion concerning certain intervenors' summary judgment motion, and the plan of partial distribution, and then argue that because the Shapiro FBO Account does not fit into any of these ten categories, the account should be treated differently. Neither of these arguments demonstrates that the Shapiros are entitled to special consideration.

While the financial impact on the Shapiros is, of course, painful and unfortunate, the Shapiros do not explain how that impact is different from the impact being felt by many other CBL customers. Second, the list does nothing to change the facts most pertinent to the equities of distribution of CBL's assets. The Shapiros transferred legal title of the assets in the Shapi-

---

7. The *Anderson* case might be relevant if CBL had had in its possession, at the time of the asset freeze, the Shapiros' transfer instruction letter, but had not yet sent the letter to Alliance, and Alliance had not yet changed the registration on the account into CBL's name. But here Alliance did receive the Shapiros' transfer instruction letter, and Alliance did change the registration on the account, thereby changing the ownership of the account in CBL's favor, months before the asset freeze.

ro FBO Account to CBL, just like the many CBL customers who put stock certificates in CBL's name. Moreover, CBL took the Shapiros' assets from them with the intent to use those assets as part of the same Ponzi scheme that included all of the other customers' assets. The fact that the mutual fund shares were not sold outright or margined by the time of the asset freeze, to take two of the Shapiros' list items, does not change the fact that CBL had the right and ability to do these things. Indeed, other customers whose shares are not currently subject to margin liens nevertheless must participate in the Plan of Partial Distribution. Every CBL customer has unique facts; to elevate a claim in equity, those facts should demonstrate that fairness requires greater consideration. The facts offered by the Shapiros do not do this.

**The MFS Document Supplied by Jankowski Further Corroborates the Fact that CBL was the "Owner" of the Jankowski FBO Account**

 Counsel for Lorraine Jankowski has joined in the Shapiros' opposition to the Receiver's motion. In addition to objecting on the general basis asserted by the Shapiros—that the FBO Accounts differ from those accounts in CBL's name alone—Jankowski's counsel provides a transfer instruction letter that predates the re-registration of the account by more than three months: it is therefore not clear whether this letter was actually the transfer instruction letter honored. In any event, Jankowski argues that the fact that Jankowski asked for the account to be put in the name of CBL "for the benefit of Lorraine Jankowski" should entitle her to full return of the assets in the account. As already noted, this request provided Jankowski with no legal protection.

Of greater significance is the rejection letter that Jankowski attaches. When Jankowski asks that the account be re-registered in "CBL's name for the benefit of Lorraine Jankowski," MFS responds that it will need a tax form "signed by the new owner." CBL is that new "owner." Jankowski was not preserving her rights when she requested this transfer, she was instead doing what all of the other CBL customers did, transferring legal title to their assets to CBL. Thus, the documents provided by Jankowski on this motion support the Receiver's position.

*Conclusion*

Because title remained in CBL and because equity requires CBL investors to be treated the same, the motion of the Receiver is granted.

It is so ordered.