SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

Stephenson Equity Company, Plaintiff–Intervenor,

v.

CREDIT BANCORP, LTD., Credit Bancorp, Inc., Richard Jonathan Blech, Thomas Michael Rittweger and Douglas C. Brandon, Defendants.

No. 99 Civ. 11395(RWS).

United States District Court, S.D. New York.

Nov. 7, 2003.

See, also, 279 F. Supp.2d 247.

Morrison & Foerster by Carl M. Loewenson, Jr., Oliver Metzger, Jin Hee Lee, New York City, for Court-appointed Receiver.

Hall, Estill, Hardwick, Gable, Golden & Nelson by Donald L. Kahl, T. Lane Wilson, Tulsa, OK, for Seco.

Krovatin & Associates by Joshua C. Gillette, Newark, NJ, for John and Karen P. Greer, Henry H. Greer, and InterBanc Mortgage Services, Inc.

Sheldon A. Weiss, Mountainside, NJ, for Stappas Intervenors.

David Constantino, Southbridge, MA, for Advisor's Capital Investments, Inc.

## *OPINION*

SWEET, District Judge.

Carl H. Loewenson Jr. Esq., as Court-appointed Receiver (the "Receiver") for Credit Bancorp, Ltd. and affiliated entities (individually and collectively, "CBL") has moved for an order allowing the Receiver to implement the plan of partial distribution, which was approved by this Court on January 19, 2001 (the "Plan").

For the reasons set forth below, the motion is approved, according to the terms of the revised Implementation Order submitted by the Receiver on October 31, 2003.

### *Prior Proceedings*

This action was initiated on November 17, 1999 by the plaintiff, the Securities and

Exchange Commission (the "SEC"), to freeze the assets of CBL upon the allegations that Richard Jonathan Blech ("Blech") and others had engaged in a complicated securities fraud. The fraud, which was in effect a Ponzi scheme, affected over 200 customers with interests exceeding $200 million. An equity receivership was established on January 21, 2000.

On November 29, 2000, this Court approved a plan of partial distribution which is in essence a pro rata return of customer-deposited property of the CBL customers, either in the form of deposited property, *i.e.*, securities, or in the form of cash or replacement securities. *See S.E.C. v. Credit Bancorp, Ltd.*, 99 Civ. 11395, 2000 WL 1752979 (S.D.N.Y. Nov. 29, 2000); *S.E.C. v. Credit Bancorp, Ltd.*, 129 F.Supp.2d 259 (S.D.N.Y.2001); *S.E.C. v. Credit Bancorp, Ltd.*, 168 F.Supp.2d 122 (S.D.N.Y.2001); Orders of January 19, 2001 and May 16, 2001. The approval of the plan of partial distribution was affirmed by the Second Circuit. *See S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80 (2d Cir.2002).

On September 30, 2003, the Receiver moved for approval of an order to implement the plan of partial distribution of the Receivership estate to qualified customers of CBL. Several letters from interested parties objecting to various aspects of the proposed Plan have been received. Oral argument on objections to the Plan, and responses by the Receiver, were heard on October 22, 2003. On October 31, 2003, the motion was deemed fully submitted.

***Proposed Implementation of the Plan***

The declaration submitted by the Receiver in support of his motion, and the proposed implementation itself describe the method by which the Plan is to be implemented.

The proposed implementation largely tracks the aspects of the plan of partial

distribution which was approved by this Court in 2000, and affirmed by the Second Circuit in 2002. The delay in the implementation of the Plan as originally approved is the result of an appeal by the Government of the United States of a previous Implementation Order, dated May 16, 2001, which held that certain assets of the Receivership estate could not be used to satisfy the liabilities for certain taxes (including taxes imposed by the United States) of CBL, Richard Blech, or any entity, fund, or account created or deemed to be created by the Receiver or pursuant to an Order of this Court. *See S.E.C. v. Credit Bancorp, Ltd.*, 138 F.Supp.2d 512, 543–545 (S.D.N.Y.2001) (holding that the Receiver had discharged his tax obligations and could commence the implementation of the plan of partial distribution). Following the Government's appeal, the United States Court of Appeals for the Second Circuit reversed the May 16, 2001 Order,

> to the extent that it found a waiver of sovereign immunity with respect to the tax liabilities of [CBL] and the Receiver, declared that [CBL's] debts to its customers take priority over its debts to the United States, and ruled that the Receiver will have no personal liability under 31 U.S.C. § 3713 if he distributes assets of the estate as contemplated by the Plan.

*S.E.C. v. Credit Bancorp, Ltd.*, 297 F.3d 127, 142 (2d Cir.2002). As a result of the Second Circuit's ruling, the Receiver submitted to the Internal Revenue Service ("IRS") a request that the IRS enter into a closing agreement (the "Closing Agreement") with the Receiver regarding the Federal income taxes owed by CBL and the Receiver. The Receiver and the IRS are now close to entering into a Closing Agreement pursuant to which the Receiver may distribute assets to CBL customers in

a plan of distribution provided that the Receiver retains a reserve for taxes of at least $5,000,000.

Certain aspects of the Plan include (1) the refusal to trace customer assets within the CBL Ponzi scheme; (2) denying a Supplemental Distribution to those customers whose deposits have appreciated 10% or more since the asset freeze; (3) offsetting the value of any distributions previously paid by CBL to customers against any distributions made to such customers under the Plan; and (4) not paying dividends or interest paid by the issuers of stock deposited with CBL prior to the asset freeze.

The Receiver has modified the proposed Plan since the original plan was approved in January 2001. The new provisions of the proposed Plan include (1) a provision that customers who requested that the Receiver sell the securities they deposited with CBL not be entitled to a Supplemental Distribution if the actual sale price of such securities represented an increase of 10% or more from the date of the asset freeze; (2) a provision indemnifying the Receiver from and against any losses incurred as a result of any claim related to tax matters by creating a pro rata indemnification obligation for each customer; and (3) a provision changing the designated market value date to five business days prior to the date that Initial Notices are sent to customers to allow time for the valuation of securities and to prepare the Initial Notices.

### Objections and Responses

#### The Stappas Intervenors

■ Plaintiffs-intervenors Thomas Stappas, Vincent J. Bagli, Andrew and Regina Calcago, Richard J. DuPont, Ronald DeYoung, Barbara DeYoung, George G. Luce, individually, George G. Luce and James F. Luce, Trustees, FBO Luce, Schwab & Kase, Inc. Profit Sharing Plan, Concetta G. Frato, Frank Mignogna, Kurt J. Richter, Stephen J. Robbins, Steven W. Allen, Trustee for Lathrop Investment Trust and Harrington Irrevocable Trust, and Lorraine Jankowski (collectively, the "Stappas Intervenors"), object to the proposed Plan on the grounds that rather than merely implementing the approved plan of partial distribution, the proposed plan significantly modifies it in that it (a) deprives every CBL customer of the benefit of the income earned on their assets between the dates of the initial deposits and the asset freeze; and (b) refuses to recognize any changes in those customer's assets between those dates.

According to the Stappas Intervenors, the plan of partial distribution approved by the Court in November 2000 "in effect contemplates 'asset tracing' by each CBL customer who transferred securities to CBL in that it permits each such customer to recover the current value of its securities, in cash or in kind, subject only to an equitable pro rata sharing of the burden of the losses occasioned by that CBL fraud." Stappas Intervenors Objections, at 2. They argue that the amount of each customers' claim under the plan as previously approved included income earned on securities prior to the asset freeze. Under the proposed Implementation Order, however, no dividends or interest paid by issuers of a customer's deposit will be paid to such customers. The Stappas Intervenors argue that such an arrangement unfairly discriminates against the class of CBL customers who deposited income bearing securities such as bonds, mutual funds and dividend-paying common stocks rather than more speculative securities such as stocks issued in connection with recent IPOs.

The Receiver's response is both principled and persuasive. The exclusion of div-

idends and interest during the period when CBL's Ponzi scheme was ongoing is consistent with the determination by the Court not to trace the course of particular assets during the fraud. Contrary to the Stappas Intervenors' assertion, tracing was categorically excluded by this Court in determining an equitable means of distributing the proceed of the Receivership estate. *See Credit Bancorp,* 2000 WL 1752979, at *15 (rejecting tracing and noting that "whether at any given moment a particular customer's assets are still traceable is a 'result of the merely fortuitous fact that the defrauders spent the money of the other victims first.' ") (*quoting United States v. Durham,* 86 F.3d 70, 72 (5th Cir.1996)). As the Receiver argues, once customers gave securities to CBL, they were used just like any other cash in the Ponzi scheme. To honor the decisions made by CBL in the course of its fraud would lend legitimacy to its conduct where none is deserved.

### Richard H. Burns

Richard H. Burns ("Burns") objects to the treatment of those victims who will not receive a Supplemental Distribution because their stock assets appreciated more than 10% since the asset freeze. According to Burns, this class of customers will also be excluded from the later distribution after the final resolution of claims with the IRS and with Deutsche Bank.

Burns misunderstands the nature of Supplemental Distribution. The initial and supplemental distributions will occur simultaneously. If a customer is excluded from the Supplemental Distribution, it will be because of the appreciation in value of the assets deposited by that customer. However, "any remaining Receivership assets after the completion of the Plan and resolution of any outstanding issues [will] be distributed to *all* customers (including those who did not receive a supplemental distribution) on a pro rata basis based on distributions under the Plan." Letter from Receiver to Court, dated October 21, 2003.

### Stephenson Equity Company

The largest victim of the fraud, Stephenson Equity Company ("SECO"), is largely supportive of the Plan, and urges the Court to approve it immediately. However, SECO has suggested three minor changes: (1) a provision that the Plan is subject to later modification by the Court; (2) requiring that the Initial Notice date be no more than 15 days after the Plan has been approved by the Court; and (3) requiring that no undertakings and/or distributions be made until after that Receiver and the IRS have entered into a Closing Agreement.

As to SECO's first objection, at oral argument the Receiver agreed to include a provision that following the initial distributions, any remaining funds "shall be used in a manner consistent with prior and further Orders of the Court." Proposed Implementation Order, ¶ EE.

As to the second objection, the Receiver has noted that the IRS is now considering whether the Closing Agreement should be modified. In light of this, the Receiver argues that it would not be advisable "to set the Plan in motion and send Initial Notices to customers until we have executed a final Closing Agreement with the IRS, because the amount of the federal income tax reserve may possibly change and subsequently affect each customer's undertaking amount." Letter from Receiver to Court, dated October 21, 2003. While SECO is correct that the implementation of the Plan should begin as quickly as possible, the possible inconvenience of a revised undertaking amount weighs in favor of postponing the Initial Notice Date until after the Receiver and the IRS enter into a Closing Agreement. SECO's final objection is also thereby addressed, as

there will be no undertakings or distribution until after the Closing Agreement is executed.

### Clay Street Capital

■ Clay Street Capital, Inc. ("Clay Street") objects to (1) the Receiver's intention not to pay or credit to customers dividends earned after bonds were deposited with CBL; and (2) the Plan's failure to define how customers who deposited bonds that matured during the term of the Receivership will be treated.

The first objection is substantially the same objection made by the Stappas Intervenors, and is addressed above. As to the second objection, the Receiver explains that:

Because bonds that have matured during the course of the Receivership are, for purposes of the Plan, no different from the sale of securities pursuant to a customer's instruction during the Receivership, a matured bond will be treated as an Attributed Identifiable Deposit that was converted to an Attributed Cash Deposit when the bond matured. The amount of the Attributed Cash Deposit would be the amount received upon the maturity of the bond.

Letter from Receiver to Court, dated October 21, 2003. The Receiver's explanation is sufficient to address Clay Street's objection.

### The Greers and Interbanc Mortgage Services

■ Jon and Karen P. Greer, Henry H. Greer (collectively, "the Greers"), and InterBanc Mortgage Services, Inc. ("Interbanc"), have not yet intervened in this action. However, their counsel has submitted a letter on their behalf setting forth their objections. A letter was also received from Paul M. Henderson, President and CEO of Interbanc. The Greers and Interbanc object to (1) the Receiver's decision not to make a Supplemental Distribution to customers with Attributed Cash Deposits in an amount equal to the product of the Supplemental Distribution Percentage and the Attributed Cash Deposits; (2) the non-recognition of transactions that took place during CBL operations; (3) the fact that some customers will receive a Supplemental Distribution despite receiving compensation from other sources, such as insurance or collateral lawsuits. In addition, the Greers and Interbanc propose that both the Supplemental Distribution and the Depreciation Adjustment should be reduced from 13% to 2%.

In a separate letter, the Greers and Interbanc ask that if the Court signs the Implementation Order, that a mechanism be created for customers "to present evidence to the Court of valuation disputes, rather than granting the Receiver the unilateral power to determine the method of value." Letter to Court from Joshua C. Gillette, dated October 24, 2003. The Greers and Interbanc also request a second hearing to address the issues raised by them and by other customers.

The Receiver has altered the terms of the initial plan by creating an exception for some customers deemed to have an Attributed Cash Deposit from the Receivership's sale, at the customer's request, of securities they deposited. The exception provides that such customer shall not be entitled to a Supplemental Distribution if the actual sale price of the such securities (before payment of brokers' fees and commissions and any other expenses and costs related to the customer sale) represented an increase of 10% or more from the value of such securities as of the date of the asset freeze. As the Receiver argues,

a customer with appreciated securities, who would not have been entitled to a Supplemental Distribution if such securities were distributed to him or her

under the Plan, will not receive a Supplemental Distribution by virtue of the Receiver having sold such appreciated securities prior to the implementation of the Plan at such customer's request. To permit otherwise would deviate from the purpose and intent of the Supplemental Distribution and Plan.

Receiver Decl., dated Sept. 30, 2003, at 6–7. The Receiver's argument is persuasive that this amendment merely closes a loophole in the Plan as originally approved. The amendment will be adopted.

■ The objection to the non-recognition of transactions taking place during CBL operations has been addressed above. As to the objection that some customers are "double-dipping" because they may be compensated from the Receivership estate as well as from insurance policies or collateral lawsuits, the Receiver has argued that he,

did not want to eliminate the incentive for any customer to obtain compensation from sources other than the Receivership. To deduct from a customer's distribution under the Plan any amounts received from collateral sources would have eliminated any incentive for customers to seek compensation from such sources. Benefits for all customers taken as a whole are maximized if customers are encouraged to seek compensation from other sources.

Letter from Receiver to Court, dated October 29, 2003. The Receiver further notes that neither the Greers nor Interbanc will be "worse off if other customers do not have their distributions reduced due to recoveries from other sources." *Id.* Accordingly, no modification in the Plan is needed to account for collateral recoveries.

The Greers and Interbanc note that Paragraph B.6 of the Plan as originally approved provided that the "Depreciation Adjustment Percentage" was estimated at 15 percent "but may be reduced by the Receiver, in his best judgment, upon a finding that there are insufficient funds to make a depreciation adjustment ..." Similarly, Paragraph B.15 provided that the "Supplemental Distribution Percentage" was estimated at 13 percent "but may be reduced by the Receiver, in his best judgment, upon a finding that there are insufficient funds to make a Supplemental Distribution ..." The Greers and Interbanc argue that because a potential $150 million insurance settlement has yielded only $50 million and because SECO stock has diminished in value, there are now insufficient funds to make either the Supplemental Distribution or the Depreciation Adjustment in the rates proposed in the original Plan without increasing the undertaking required from other customers.

The Receiver responds that it is incorrect that there are insufficient funds to make the Supplemental Distribution or the Depreciation Adjustment. The Receiver first notes that the decision to reduce either figure is left to the discretion and/or the best judgment of the Receiver. In so exercising his discretion and best judgment, the Receiver has found that there are sufficient funds. Further, the Receiver explains that "the qualification for insufficient funds was based on the then-current assumption that the Supplemental Distribution and Depreciation Adjustment would be paid only from undertaking payments on customer-deposited securities in European accounts that were not at the time under the Receiver's control." Letter from Receiver to Court, dated October 29, 2003. Because those securities will soon be under the Receiver's control, in addition to the receipt of a $58,250,000 insurance settlement, the Receiver concludes that there are sufficient funds to make the Supplemental Distribution and Depreciation Adjustment. The Receiver's

explanation is sufficient, and the Receiver's decision will not be disturbed.

The request for a mechanism for an appeal of valuation disputes has already been addressed, and the Receiver has modified the Plan "to allow customers to appeal to the Court [the Receiver's] determinations with respect to challenges brought by customers contesting the information set forth in the Records Confirmation Notices." Receiver Decl., dated October 31, 2003, at 1–2; *see also* proposed Implementation Order, ¶ C. The request for a second hearing is denied, as the Court has considered and addressed the objections of interested parties.

### Conclusion

For the reasons set forth above, the motion by the Receiver to implement the Plan of partial distribution according to the terms of the revised Implementation Order submitted by the Receiver on October 31, 2003 is approved.

It is so ordered.